UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KELSEY H.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02504-MJD-JMS |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Claimant Kelsey H. requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") partially denying her Social Security application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. *See* 42 U.S.C. §§ 423(d), 1382. For the reasons set forth below, the Court **REVERSES** and **REMANDS** the decision of the Commissioner.

**I. Background**

Claimant applied for DIB and SSI on July 24, 2017, alleging an onset of disability as of June 16, 2016. [Dkt. 15-5 at 2, 6.] Claimant's applications were initially denied on September 11, 2017, [Dkt. 15-4 at 7, 16], and again upon reconsideration on November 13, 2017, [Dkt. 15-4 at 25, 32]. A hearing was held before Administrative Law Judge Kevin M. Walker ("ALJ") on July

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

1

19, 2019. [Dkt. 15-2 at 61-104.] On September 30, 2019, ALJ Walker issued his determination that Claimant was disabled from June 16, 2016, through June 7, 2018, but that Claimant's disability ended on June 8, 2018, due to medical improvement related to the ability to work. [Dkt. 15-2 at 41.] The Appeals Council then denied Claimant's request for review on July 30, 2020. [Dkt. 15-2 at 2.] On September 29, 2020, Claimant timely filed her Complaint seeking judicial review of the ALJ's decision regarding the time period from June 8, 2018, onward. [Dkt. 1.]

## II.  Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423.[2] Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform her past relevant work, she is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform her past relevant work, but can

---

[2] DIB and SSI claims are governed by separate statutes and regulations that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to those that apply to DIB.

perform certain other available work, she is not disabled. 20 C.F.R. § 404.1520. Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).

In reviewing a claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). An ALJ need not address every piece of evidence but must provide a "logical bridge" between the evidence and his conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether the claimant is disabled. *Id.*

### III.  ALJ Decision

ALJ Walker first determined that, although Claimant did not engage in substantial gainful activity ("SGA") between the alleged onset date of June 16, 2016, and June 7, 2018, Claimant did engage in SGA from June 8, 2018, through the date of his decision. [Dkt. 15-2 at 44.] Accordingly, he proceeded to step two only with regard to the period between June 16, 2016, and June 7, 2018. With regard to that period, at step two, the ALJ found that Claimant had the following severe impairments: "type 1 diabetes with recurrent diabetic ketoacidosis (DKA), diabetic autonomic neuropathy, gastroparesis, weight loss, bipolar affective disorder,

oppositional defiant disorder (ODD), and benzodiazepine abuse (20 CFR 404.1520(c) and 416.920(c))." [Dkt. 15-2 at 44.] At step three, the ALJ found that Claimant's impairments did not meet or medically equal a listed impairment during the relevant time.[3] [Dkt. 15-2 at 45.] The ALJ then found that, during the relevant time period of June 16, 2016, through June 7, 2018, Claimant had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; push/pull unlimited except for the weights indicated; stand or walk for up to 6 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; occasionally climbing ramps or stairs; never climbing of ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; no exposure to unprotected heights or hazardous machinery; and unscheduled absences of more than 4 days per month.

[Dkt. 15-2 at 46-47.]

At step four, the ALJ found that Claimant was unable to perform any of her past relevant work during the relevant time period of June 16, 2016, through June 7, 2018. [Dkt. 15-2 at 48.] At step five, the ALJ, relying on testimony from a vocational expert ("VE"), determined that there were no jobs that existed in significant numbers in the national economy that the claimant could have performed between June 16, 2016, through June 7, 2018. [Dkt. 15-2 at 49]; *see* [Dkt. 15-2 at 90] (VE testifying that unscheduled absences of four or more days per month would preclude any competitive employment). Accordingly, the ALJ concluded that Claimant was disabled from June 16, 2016, through June 7, 2018. [Dkt. 15-2 at 50.]

## IV.  Discussion

Claimant, a high school graduate, was 22 years old at the time she filed for DIB and SSI. [Dkt. 25 at 3.] Her medical records related to uncontrolled type 1 diabetes mellitus with recurrent

---

[3] The Court notes that, during Claimant's hearing, the ALJ stated, "I think we clearly meet listing nine. . . . For the DKA, it's there." [Dkt. 15-2 at 71.]

4

diabetic ketoacidosis ("DKA"), gastroparesis, and seizure disorders are extensive.[4] Despite trying insulin pumps, daily injections, and feeding tubes, Claimant's blood sugar fluctuates drastically and she requires almost monthly hospitalizations for DKA. [Dkt. 15-2 at 65-66.] There is no dispute that Claimant was disabled from June 16, 2016, through June 7, 2018. Rather, Claimant asks the Court to reverse the ALJ's findings that Claimant's disability ended on June 8, 2018, and that she did not become disabled again between that date and the date of the ALJ's decision. *See* [Dkt. 15-2 at 50].

The ALJ determined that Claimant was not disabled between June 8, 2018, which is the date Claimant was hired by Complete Comfort Heating and Air Conditioning, through the date of his decision on September 30, 2019, because she was engaged in SGA during that entire period. [Dkt. 15-2 at 50.] *See* 20 C.F.R. § 404.1520 (providing at step one that if the claimant is

---

[4] Regarding Claimant's hospitalizations from June 16, 2016, through June 7, 2018, ALJ Walker stated as follows:

> The medical records reflect diagnoses of type 1 diabetes with recurrent DKA, diabetic autonomic neuropathy, gastroparesis, weight loss, bipolar affective disorder, ODD, and benzodiazepine abuse. From June 16, 2016 through June 7, 2018, the medical evidence documents at least 18 hospitalizations related to the claimant's diabetes. They are as follows: December 22-23, 2016 (6F/436); December 23-25, 2016 (3F/124); February 3-5, 2017 (6F/180); April 10-14, 2017 (6F/212-213); May 11-14, 2017 (5F/39); May 23-27, 2017 (3F/40); June 25-26, 2017 (5F/2); July 6-10, 2017 (6F/264); July 24-26, 2017 (6F/279-280); September 4-7, 2017 (16F/184-185); October 29-30, 2017 (16F/268-269); November 26-29, 2017 (16F/355-356); January 6-8, 2018 (16F/424); January 9-10, 2018 (17F/606); February 9-10, 2018 (17F/502); March 5-6, 2018 (17F/398); March 18-20, 2018 (17F/292); and May 22-23, 2018 (17F/165-166). At most of these hospitalizations, the claimant's principal [sic] discharge diagnosis was DKA without coma associated with type 1 diabetes mellitus. Her primarily complaints were generalized abdominal pain and intractable nausea and vomiting. The claimant's numerous hospitalizations are consistent with unscheduled work absences of more than 4 days per month.

[Dkt. 15-2 at 47.]

5

engaged in substantial gainful activity, she is not disabled). In finding that Claimant returned to continuous SGA on June 8, 2018, ALJ Walker explained as follows:

> The claimant was hired by Complete Comfort Heating and Air Conditioning on June 8, 2018 (4D). She earned $15,781 from June 8 through December 31, 2018 (2nd quarter 2018 - $990; 3rd quarter 2018 - $7,761; 4th quarter 2018 - $7,030), and $8,625 from January 1 through June 30, 2019 (1st quarter 2019 - $4,650; 2nd quarter 2019 - $3,975) (4D, 8D, 10D, 11D). Monthly earnings of at least $1,180 in 2018 and $1,220 in 2019 constitute SGA (POMS DI 10501.015). The claimant's average monthly earnings were $2,254 in 2018 and $1,437.50 in 2019. The claimant's monthly earnings are averaged, as this work has been continuous without significant changes in work patterns or earnings in each respective year (20 CFR 404.1574a, 416.974a, and SSRs 83-35 and 85-5c).

[Dkt. 15-2 at 50.]

There are two main problems with this analysis. First, Claimant's second quarter 2019 earnings do not amount to $3,975. The only income information available for the second quarter of 2019 is Claimant's paystub for the period of June 17, 2019, through June 23, 2019. [Dkt. 15-5 at 33] (11D:2).] The paystub shows 25.50 hours worked at a rate of $15.50/hour, totaling $395.25 for that one-week period. As ALJ Walker acknowledged during Claimant's hearing, the paystub also shows 40 hours of vacation pay, totaling $620.00 that was paid to Claimant but did not represent actual wages earned. *See* [Dkt. 15-2 at 63] (hearing transcript in which ALJ Walker states, "[a]ll right, I see the 40 hours of vacation pay there"). The paystub additionally shows that Claimant's 2019 year-to-date earnings amounted to $8624.75. ALJ Walker presumably took that amount and subtracted Claimant's first quarter 2019 earnings of $4,650, *see* [Dkt. 15-5 at 24] (8D:1)], to reach $3,975, but failed to subtract the 40 hours of vacation pay. *See* POMS DI 10505.010(C) ("If an individual receives sick or vacation pay for non-work days in a particular month, that pay should not be considered countable income for that month"); *see also Laureen P. v. Saul*, 2020 WL 1044012, at *4 (N.D.N.Y. Mar. 4, 2020) (referring to POMS DI 10505.010(C) and stating, "[a]lthough POMS are only guidelines, they 'represent the Commissioner's

6

interpretation of the statutory mandate, they deserve substantial deference, and will not be disturbed as long as they are reasonable and consistent with the statute.'") (citing *Bubnis v. Apfel,* 150 F.3d 177, 181 (2d Cir. 1998)). Appropriately subtracting Claimant's vacation pay results in a total of $3,354.75—not $3,975—for Claimant's second quarter 2019 earnings.

Second, the ALJ appears to reach Claimant's monthly earnings by averaging her yearly earnings over the entire work period. For example, Claimant earned a total of $15,781 for the second, third, and fourth quarters of 2018. Dividing that sum by the seven months worked arrives at an average of $2,254 per month, which ALJ Walker states is Claimant's average monthly earnings for 2018. However, SSR 83-35 provides the following:

> When there is a significant change in work patterns or earnings during the period of work requiring evaluation, earnings are not averaged over the entire period of work involved. When there is such a change, it would not be appropriate to average earnings over the entire work period, since one period of work activity may not be representative of the other period. Unrepresentative periods of work involve separate and distinct work efforts. When there is a significant change in work patterns or earnings, the earnings must be averaged over each separate period of work involved to determine if either effort was SGA.

SSR 83-35, 1983 WL 31257, at *4.

Here, despite the ALJ's assertion otherwise, there is a stark change in Claimant's earnings: from the second quarter of 2018 to the second quarter of 2019, Claimant's quarterly earnings were $990, $7,761, $7,030, $4,650, and $3,355, respectively. Those numbers are vastly different and represent a significant change in Claimant's work patterns. This change is substantiated by the record, beginning with Claimant's own testimony. Indeed, at Claimant's July 19, 2019, hearing, she testified that she began working at Complete Comfort Heating & Air Conditioning on June 8, 2018. [Dkt. 15-2 at 68.] The ALJ asked Claimant the following: "When you went to, to the heating and cooling job, had you gotten better? You were able to work more?" [Dkt. 15-2 at 72.] Claimant responded:

7

> I had gained a little bit of weight. I was able to also get with my church family and they provided services through Safe Families and they took my son for a couple of weeks and we would have visits but it was ultimately to get me back on track of being able to do what I needed to do . . . to get a little bit better.

[Dkt. 15-2 at 73.] Claimant was then able to put her son in daycare and subsequently found the office job with Complete Comfort, which she was able to perform. [Dkt. 15-2 at 74.] However, at the hearing in July 2019, Claimant's attorney pointed out that Claimant was only working "a couple of days a week" at that time. [Dkt. 15-2 at 67.] Claimant testified that she was hospitalized from around March 23 or 24, 2019, until around April 10 or 11, 2019, because she had a J-tube placed in her stomach. [Dkt. 15-2 at 69-70]; *see* [Dkt. 15-22 at 193] (confirming Claimant's J-tube placement on April 5, 2019). Consequently, she explained, Complete Comfort had to hire additional office staff "because my boss can't trust me to keep . . . on the special projects and I would start something and then end up in the hospital and he wouldn't know when I would be back." [Dkt. 15-2 at 74-75.] Claimant testified that, although she was still working at Complete Comfort at the time of the hearing, "[t]hey only allow me to come in Mondays and Fridays now, because like I said, I'm only there to do catchup work. They don't put me on anything like answering phones . . . or taking care of customers or projects anymore." [Dkt. 15-2 at 96.][5]

---

[5] During Claimant's hearing, ALJ Walker even acknowledged the end of Claimant's SGA, stating, "I've never had this before. I've had closed periods where it was just a closed period. . . . I'm thinking a closed period and then a new period. . . . I don't know mechanically how that works." [Dkt. 15-2 at 87.] ALJ Walker noted that this new period of disability began "around March 22nd of 2019 . . . where we have a deterioration of the diabetic condition." [Dkt. 15-2 at 97]; *see* [Dkt. 15-2 at 72] (ALJ Walker reiterating, "[t]hen from June 8, 2018, to March 22nd or so of 2019, you're, you're back working."). He continued:

> We have recovery. You gained weight. Things got a little bit better for a while. You were able to work full-time for a while, and then we have a deterioration again. . . . So basically a closed period, two year closed period. . . . Some recovery . . . and then a new period.

8

The change in Claimant's work patterns and earnings is further evidenced by her medical records, indicating continued frequent hospitalizations after June 8, 2018. Those hospitalizations are as follows: July 14, 2018 [Dkt. 15-13 at 86 (14F:11)]; August 27, 2018 [Dkt. 15-13 at 117 (14F:42)]; November 11, 2018, to November 13, 2018 [Dkt. 15-16 at 252 (16F:531)]; November 30, 2018, to December 1, 2018 [Dkt. 15-13 at 146 (14F:101)]; December 2, 2018 [Dkt. 15-18 at 10 (17F:9)]; December 3, 2018, to December 6, 2018 [Dkt. 15-14 at 15 (15F:14)]; December 28, 2018, to December 29, 2018 [Dkt. 15-14 at 128 (15F:127)]; December 31, 2018, to January 2, 2019 [Dkt. 15-17 at 48 (16F:614)]; February 6, 2019, to February 8, 2019 [Dkt. 15-20 at 194 (23F:10)]; February 8, 2019 [Dkt. 15-20 at 173 (22F:11)]; March 11, 2019, to March 12, 2019 [Dkt. 15-22 at 14 (28F:13)]; March 13, 2019, to March 14, 2019 [Dkt. 15-22 at 66 (28F:65)]; March 22, 2019, to March 26, 2019 [Dkt. 15-21 at 116 (26F:115)]; March 27, 2019 [Dkt. 15-22 at 143 (28F:142)]; March 28, 2019, to April 1, 2019 [Dkt. 15-21 at 26 (26F:25)]; May 5, 2019, to May 6, 2019 [Dkt. 15-22 at 170 (28F:169)]; May 11, 2019 [Dkt. 15-22 at 201 (28F:200)]; and May 12, 2019, to May 15, 2019 [Dkt. 15-22 at 267 (28F:266)].[6] It should go without saying that

---

[Dkt. 15-2 at 98.] The ALJ concluded the hearing by stating the following:

> So what I'm looking at, I think you probably have picked up, you know, we had a two-year period where I think you're disabled. We have another period where you went back to work and you were above that regulatory limit. . . . So I don't have any discretion and then obviously you deteriorated again this spring and that takes us forward.

[Dkt. 15-2 at 102-03.]

[6] Because the ALJ (erroneously) determined at step one that Claimant engaged in continuous SGA beginning on June 8, 2018, he did not consider any of this evidence concerning Claimant's hospitalizations after June 8, 2018. For this reason, Claimant's additional argument that the ALJ erred by failing to consider her post-June 8, 2018, medical records, [Dkt. 25 at 18], is irrelevant although nonetheless well-taken. It should also be noted that, although ALJ Walker found that "at least 18 hospitalizations" from June 16, 2016, to June 7, 2018, were consistent with

9

these records plainly show that Claimant was regularly absent from work, thereby resulting in her significantly different earnings.

Taking this into account, it is clear Claimant's earnings cannot be averaged by the entire work period. *See* SSR 83-35, 1983 WL 31257, at *4. The available income evidence is broken down by yearly quarters, and each quarter's earnings should therefore be averaged by the three months it represents. Accordingly, Claimant's earnings are actually as follows: during the second quarter of 2018, Claimant earned $990, but because she began working in June—the final month of the quarter—her monthly average for that period was $990; during the third quarter of 2018, Claimant earned $7,761, meaning that her monthly average for that period was $2,587; during the fourth quarter of 2018, Claimant earned $7,030, meaning that her monthly average for that period was $2,343; during the first quarter of 2019, Claimant earned $4,650, meaning that her monthly average for that period was $1,550; and finally, as noted above, during the second quarter of 2019, Claimant earned $3,355, meaning that her monthly average for that period was $1,118.

Utilizing this data reveals that, while Claimant did engage in SGA from July 2018 to March 2019, her monthly averages for June 2018 and April 2019 through June 2019 do not meet the SGA monthly thresholds of $1,180 for 2018 and $1,220 for 2019. POMS DI 10501.015. It was therefore improper for ALJ Walker to determine that Claimant was not disabled from June 18, 2018, onward solely because she engaged in SGA.

---

unscheduled work absences of more than 4 days per month—which meant Claimant was unable to work and thus disabled—he did not bother to consider why the same number of hospitalizations from July 2018 to May 2019—an even shorter timeframe—did not require the same conclusion. *See* [Dkt. 15-2 at 47].

Accordingly, the ALJ's determination that Claimant was not disabled from June 8, 2018, through the date of his decision on the ground that she engaged in SGA is not supported by substantial evidence because that determination was based on his erroneous earnings calculations. This error requires remand.[7]

### V. Conclusion

For the reasons set forth above, the Commissioner's decision is **REVERSED** and **REMANDED for further proceedings consistent with this Order**.

SO ORDERED.

Dated: 31 JAN 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the Court's ECF system.

---

[7] Claimant additionally argues that the Appeals Council committed reversible error by failing to evaluate new and material evidence. [Dkt. 25 at 14.] However, this issue is mooted by the fact that the ALJ's decision must be reversed on other grounds and, therefore, the Court will not address it.